IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NOBEL LEARNING COMMUNITIES, | : | |
| INC. | : | NO. 09-1818 |


MEMORANDUM

McLaughlin, J.                                      November 2, 2009


        The United States of America brought suit through its
enforcement powers against Nobel Learning Communities, Inc.
("NLC"), a private, for-profit corporation that operates a
charter school network.  The United States claims that NLC is
engaged in discriminatory practices in violation of the Americans
with Disabilities Act ("Title III" or "ADA") and its implementing
regulations.  It alleges that NLC discriminated and will continue
to discriminate against children with disabilities and their
families by failing to enroll or by disenrolling from its schools
children with disabilities.  The government identifies twelve
children and their families who suffered such injury, and it
seeks declaratory and injunctive relief, damages, and civil
penalties against NLC.

        The defendant moves to dismiss the complaint except for
allegations of individualized discrimination against the twelve
children identified in the complaint.  The Court will grant in
part and deny in part the defendant's motion to dismiss.

I.    <u>Allegations in the Complaint</u>[1]

NLC owns or operates a network of private day care centers, preschools, and elementary and secondary schools[2] in numerous states and the District of Columbia.[3]  There are at least fifteen different NLC academies.[4]  Compl. ¶ 5; Hr'g Tr. 4:19-20, October 6, 2009.

Twelve students (S.O., A.M., L.B., T.C., A.R., A.W., M.E., A.D., R.R., J.H., D.B., and E.V.) who have neurological disabilities that substantially limit one or more major life activities were either disenrolled or denied enrollment from NLC schools between 2005 and 2008.  Nine of the students were

---

[1] All citations to the complaint are to the redacted complaint that was publically filed.  The redacted complaint replaced the names of the children with their initials and omitted the specific day and month of the children's birth dates, but it is the same in all other respects as the unredacted complaint filed under seal.

[2] The complaint refers to the NLC network as comprising day care centers and nursery, elementary, and secondary schools. Compl. ¶5.  At oral argument, however, both parties referred to the "nursery schools" as "preschools."  Hr'g Tr. 4:19-20, October 6, 2009.  For sake of clarity, the Court will refer to NLC as a network of day care centers, preschools, and elementary and secondary schools.

[3] The plaintiff does not allege the number of NLC-operated schools, the number of states in which these schools operate, the number of students enrolled in these schools, or the number of students denied enrollment or disenrolled from these schools.

[4] Numerous schools may operate under the same academy name. For example, students S.O., A.M., L.B., and T.C. all attended Chesterbrook Academy in Pennsylvania, and A.R. attended Chesterbrook Academy in Illinois.

disenrolled and three were denied enrollment. These twelve students were associated with seven NLC schools located in six states across the nation. Compl. ¶¶ 6-17.

Eight of the nine disenrollment incidents occurred between April 2006 and December 2006, and the remaining disenrollment occurred in May 2008. The disenrollments took place in six different schools and in five different states. They occurred anywhere from two months to five years after the child enrolled in an NLC school. Compl. ¶¶ 6-10, 12, 15-17.

The three specified denials of enrollment occurred in three different states. Two students were denied enrollment in 2005, and the third student was denied enrollment in 2007. Compl. ¶¶ 11, 13, 14.

Eleven of the twelve children identified in the complaint were under age six at the time of the defendant's action and were either disenrolled or denied enrollment from an NLC preschool. The eleven children were excluded from six different schools that are located in six different states. The one child identified in the complaint who was over age six at the time of the defendant's action was eight years old and was disenrolled from an NLC elementary school. Compl. ¶¶ 6-17; Hr'g Tr. 5:12-21.

The government claims that NLC took these actions against the twelve named students and other children like them

on the basis of the students' disabilities.  It further alleges
that "[f]rom at least 2005, NLC instituted a policy to exclude,
remove, or otherwise discriminate against children with
disabilities from NLC programs," and that NLC has acted on this
policy by excluding, removing, or otherwise discriminating
against such children.  The government asserts that NLC's
discrimination has caused the students to suffer emotional and
mental pain, and that further discrimination may injure other
students with disabilities.  Compl. ¶¶ 1, 6-17, 18, 19.

        The plaintiff also alleges that families of children
with disabilities were "denied a full and equal opportunity to
participate in or benefit from the goods, services, facilities,
privileges, advantages, or accommodations of NLC."  It alleges
that the families suffered injury, including "the loss of child
care and the attendant consequences for employment or other
opportunities; the loss or denial of the opportunity to select,
participate in, or benefit from the education offered by NLC's
programs; financial loss, emotional pain, mental anguish, and
prolonged anxiety."  Other families, it argues, may be harmed if
NLC continues to discriminate.  Compl. ¶¶ 20-21.

        The plaintiff argues that the defendant's actions
constitute violations of five sub-provisions of Title III and
their implementing regulations: (1) a denial of the opportunity
to participate in or benefit from the goods, services,

4

facilities, privileges, advantages, or accommodations of an
entity;[5] (2) the use of standards or criteria of administration
that have the effect of discriminating; (3) the imposition or
application of eligibility criteria that screen out or tend to
screen out individuals with disabilities; (4) failure to make
reasonable modifications when such modifications are necessary to
afford the goods, services, facilities, privileges, advantages,
or accommodations to individuals with disabilities; (5)
discrimination by association.  42 U.S.C. §§ 12182(b)(1)(A)(i),
(b)(1)(D), (b)(2)(A)(i), (b)(2)(A)(ii), (b)(1)(E)(2009); 28
C.F.R. §§ 36.201, 36.202, 36.203, 36.204, 36.301, 36.302, 36.205
(2009).

II.  Analysis

        The defendant moves to dismiss all claims in the
plaintiff's complaint except for any claim related to individual
discrimination against the twelve identified children.
Specifically, it seeks to dismiss the three claims alleging that
NLC engaged in discrimination pursuant to a policy, the
allegation of a failure to provide reasonable modifications, and

---

[5] The plaintiff and defendant discuss this allegation as a
claim of individual discrimination against the twelve identified
students and a claim of a pattern or practice of discrimination
throughout all NLC schools.

the allegation of discrimination by association.  Def.'s M. 7-8.[6]

A.  <u>Motion to Dismiss Standard</u>

The current standard for an adequately pled complaint
was set out in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544
(2007).  Under <u>Twombly</u>, to state a claim, a party's factual
allegations must raise a right to relief above the speculative
level.  <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 232 (3d
Cir. 2008) (citing <u>Twombly</u>, 550 U.S. at 555).

The Supreme Court reaffirmed and clarified the <u>Twombly</u>
standard in <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009).  The <u>Iqbal</u>
Court explained that although a plaintiff is not required to make

_____

[6]  The government argues as one rationale for opposing the
motion to dismiss that, because NLC does not seek to dismiss any
claims of individualized discrimination against the twelve
identified students, the entire complaint is well-pled because
there is an intimate relationship between individualized
discrimination and the five other types of discrimination.  The
plaintiff further argues that to hold otherwise would force the
plaintiff to choose a legal theory at the pleading stage, which
the Supreme Court rejected in <u>Swierkiewicz v. Sorema N.A.</u>, 534
U.S. 506 (2002).

The Court disagrees.  First, courts post-<u>Iqbal</u> routinely
grant partial motions to dismiss.  Second, <u>Swierkiewicz</u> is
inapposite to the plaintiff's case because it stood for the
proposition that a plaintiff alleging workplace age and national
origin discrimination need not allege facts to support a prima
facie showing of the court-created <u>McDonnell Douglas</u> test.
Third, the United States Court of Appeals for the Third Circuit
found <u>Iqbal</u> and <u>Twombly</u> to have effectively overruled
<u>Swierkiewicz</u> to the extent that it concerns pleading
requirements.  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 211 (3d
Cir. 2009).

"detailed factual allegations, . . . [a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. at 1949. Rather, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." Id. A claim has facial plausibility when the plaintiff pleads sufficient factual content to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Id.

The Supreme Court has explained that "two working principles" underlie a motion to dismiss inquiry. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (applying the motion to dismiss standard under Iqbal to the disability discrimination context).

"Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S. Ct. at 1950; Fowler, 578 F.3d at 211. Determining whether a complaint states a plausible claim for relief is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950. But where the facts pled do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but has not "shown," that the pleader is entitled to relief within the meaning of Rule 8(a)(2). Id.

### B. Policy of Discrimination

Contending that the complaint does not plausibly allege that NLC engaged in discrimination pursuant to a policy, the defendant moves to dismiss the plaintiff's allegations that NLC (1) engaged in a pattern or practice of discrimination, (2) used standards or criteria of administration that have the effect of discriminating, and (3) imposed or applied eligibility criteria that screen out or tend to screen out disabled individuals.

The Court grants the defendant's motion to dismiss the allegations of discrimination pursuant to a policy existing outside the preschool context. It denies the motion to dismiss these allegations that are directed at the preschool level.

### 1. Pattern or Practice of Discrimination

To survive a motion to dismiss a pattern or practice claim, the plaintiff must plead factual content that allows the court to draw a reasonable inference that the defendant engaged in "more than the mere occurrence of isolated or 'accidental' or

sporadic discriminatory acts." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 (1977). It must sufficiently allege that "discrimination was the company's standard operating procedure–the regular rather than the unusual practice." Id. A plaintiff can prove a pattern or practice of discrimination by the existence of an express discriminatory policy, or by numerous instances of discrimination and anecdotal evidence from which a discriminatory pattern or practice can be inferred. Teamsters, 431 U.S. at 335 (numerous instances); United States v. Bd. of Educ., 911 F.2d 882, 892 (3d Cir. 1990) (express policy). At the motion to dismiss stage, the plaintiff need only allege sufficient facts that allow a court to reasonably infer a pattern or practice of discrimination.

The defendant advances three arguments to demonstrate that the plaintiff's complaint lacks sufficient factual allegations to raise a reasonable inference of a discriminatory pattern or practice. It argues that (1) the complaint lacks factual allegations that NLC has a discriminatory policy; (2) twelve instances of alleged discrimination do not constitute a pattern or practice, but are merely consistent with the defendant's liability; and (3) the complaint lacks statistical information to demonstrate the breadth of the policy and lacks factual allegations of discrimination at the day care, elementary and secondary level.

The plaintiff counters that twelve instances of alleged discrimination are sufficient to suggest a widespread pattern or practice throughout all of the defendant's schools. Further, it argues that statistics are unnecessary at this stage of the litigation to sufficiently allege a pattern or practice of discrimination.

The Court finds that the plaintiff has sufficiently alleged a pattern or practice of discrimination at the preschool level because its complaint contains numerous instances of discrimination that reasonably give rise to an inference of a pattern or practice of discrimination in the defendant's preschools. See Teamsters, 431 U.S. at 335. The complaint identifies eleven children who were either disenrolled or denied enrollment from the defendant's preschools. The defendant conducted the disenrollments of all eight identified preschool students between April 2006 and December 2006. The defendant denied enrollment to all three identified preschool students in 2005 and 2007. These facts constitute sufficient instances of alleged discrimination in the preschool setting to survive a motion to dismiss. See United States v. Lansdowne Swim Club, 894 F.2d 83, 88-89 (3d Cir. 1990) (affirming bench trial finding of pattern or practice when three black applicants were continually turned away from a private pool).

The Court disagrees with the defendant's argument that

because the complaint lacks statistical data to demonstrate the breadth of the alleged discriminatory policy and because the preschool students are associated with six schools in six states, the plaintiff's allegations suggest merely child-specific decision making or, at worst, sporadic instances of discrimination.  Although many courts use statistical information at the summary judgement stage to evaluate pattern or practice claims, such data is not required to survive a motion to dismiss. See Teamsters, 431 U.S. at 337 (affirming finding of a pattern or practice of discrimination by relying on statistics and expert reports); Seils v. Rochester City Sch. Dist., 192 F. Supp. 2d 100, 118-19 (W.D.N.Y. 2002) (granting summary judgment when plaintiffs relied purely on anecdotes rather than statistics).

The Court will grant the defendant's motion to dismiss, however, to the extent that the plaintiff's complaint alleges a discriminatory pattern or practice at the day care, elementary, or secondary level.  The plaintiff admits that only one of the twelve identified children disenrolled or denied enrollment by the defendant was an elementary school student, and none of the identified children was enrolled or attempted to enroll in a day care or secondary setting.  See Compl. ¶¶ 6-17; Hr'g Tr. 5:14-21. One instance of alleged discrimination in the elementary setting is insufficient to give rise to an alleged pattern or practice of discrimination throughout all of the defendant's elementary

schools.  See Ste. Marie v. E. R.R. Ass'n, 650 F.2d 395, 406 (2d Cir. 1981) (finding two incidents of discrimination throughout nine offices insufficient to create a pattern or practice, absent evidence of a policy of discrimination); Collins v. Chichester Sch. Dist., No. 96-6039, 1998 U.S. Dist. LEXIS 9561 (E.D. Pa. June 30, 1998) (granting motion to dismiss because the complaint alleged only one instance of discrimination and was devoid of factual support).

The lack of any facts alleging discrimination at the day care or secondary level also fails to create a reasonable inference of a discriminatory policy at these levels of schooling.  See Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 877-78 (1984) ("It is [] clear that a class [action] plaintiff's attempt to prove the existence of a companywide policy, or even a consistent practice within a given department, may fail even though discrimination against one or two individuals has been proved.").

The plaintiff argues that because the defendant is one entity, a pattern of discrimination at the preschool level gives rise to a reasonable inference of a widespread discriminatory policy at all levels of schooling.  The Court disagrees.  In Cooper v. Federal Reserve Bank of Richmond, 467 U.S. at 878, the Supreme Court found that an employer's proven discrimination against two employees in a specific employment grade was

insufficient to support the conclusion that the same employer engaged in a pattern or practice of discrimination against employees in lower grades. Applied here, the plaintiff's allegations of a pattern or practice of discrimination at the preschool level cannot reasonably create an inference of such discrimination at different levels of schooling.

The plaintiff has also not sufficiently alleged that NLC employs an express discriminatory policy at the day care, elementary, or secondary school level. See Bd. of Educ., 911 F.2d at 892. In its complaint, the plaintiff argues that "NLC instituted a policy to exclude, remove, or otherwise discriminate against children with disabilities," but it fails to include any facts to substantiate this claim. The government's allegation reads more like a "formulaic recitation of the elements" of a pattern or practice claim and is insufficient to withstand NLC's motion to dismiss. See Iqbal, 129 S. Ct. at 1949.

2.    Standards or Criteria with the Effect of
      Discriminating and Eligibility Criteria that
      Screen Out Individuals

The Court will grant the defendant's motion to dismiss allegations of NLC's use of both standards or criteria with the effect of discriminating and eligibility criteria that screen out or tend to screen out individuals with disabilities, to the extent that the allegations relate to the defendant's policies at its day care, elementary, and secondary schools. The Court will

deny the defendant's motion to dismiss these claims, however, to the extent that they are directed at NLC's preschools. Although the issue is close, the Court finds that the complaint adequately states a claim for violations of these ADA provisions in the NLC preschool setting.

C.   Reasonable Modifications

Title III prohibits an entity's failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford its goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. The entity will not be liable under Title III, however, if it can demonstrate that making such modifications would fundamentally alter the nature of its goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b)(2)(a)(ii).

The defendant asserts that in order to survive a motion to dismiss, the plaintiff must allege factual matter sufficient to plausibly infer that the students with disabilities requested reasonable modifications. NLC argues that the complaint is devoid of factual allegations that children requested reasonable modifications, and therefore the complaint does not provide sufficient notice to NLC of this claim.

The plaintiff asserts in its brief that it is reasonable to infer that the children requested but were denied

14

reasonable modifications.  At oral argument, the plaintiff argued
that entities covered under Title III have an ongoing obligation
to review their policies and make modifications when necessary.
It also explained that the nine identified students enrolled in
NLC schools were already receiving certain modifications and that
it is reasonable to infer, from their subsequent disenrollment,
that the defendant failed to make further modifications.  The
government offered to amend its complaint to this effect, if
necessary.  Hr'g Tr. 8-11.

The Court will grant the defendant's motion to dismiss
the plaintiff's reasonable modifications claim to the extent that
it relates to NLC's day care, elementary, and secondary settings.
It will deny the defendant's motion, however, to the extent that
it relates to NLC's preschools.  Again, the Court finds that the
plaintiff adequately states a claim at the preschool level of
NLC's failure to provide reasonable modifications.

### D.   Associational Discrimination

The plaintiff's claim of associational discrimination
presents the question whether Title III of the ADA allows
families to recover for indirect consequences associated with a
child's exclusion from an NLC school.  The Court holds that it
does not.  Title III's associational discrimination provision
protects a non-disabled individual from discrimination directed
specifically against the non-disabled individual because of his

or her association with a person with disabilities.  The Court

also finds that the complaint fails to state a claim for direct

discrimination against the families of the disabled children.

> Title III provides:
>
> It shall be discriminatory to exclude or
> otherwise deny equal goods, services,
> facilities, privileges, advantages,
> accommodations, or other opportunities to an
> individual or entity because of the known
> disability of an individual with whom the
> individual or entity is known to have a
> relationship or association.

42 U.S.C. § 12182(b)(1)(E).  Other parts of the ADA also

recognize associational discrimination claims.  Title I of the

ADA, covering the employment context, includes a counterpart

associational discrimination provision, and Title II of the ADA,

covering public services, has regulations prohibiting

associational discrimination.  See 42 U.S.C. § 12212(b)(4); 28

C.F.R. § 35.130(g).

> The Department of Justice's regulation implementing

Title III merely repeats the language of the Title III statute:

> A public accommodation shall not exclude or
> otherwise deny equal goods, services,
> facilities, privileges, advantages,
> accommodations, or other opportunities to an
> individual or entity because of the known
> disability of an individual with whom the
> individual or entity is known to have a
> relationship or association.

28 C.F.R. § 36.205.

> In the commentary accompanying its Title III

associational discrimination regulations, the Department of

Justice explains:

> The individuals covered under this section
> include any individuals who are discriminated
> against because of their known association
> with an individual with a disability.  For
> example, it would be a violation of this part
> for a day care center to refuse admission to
> a child because his or her brother has HIV
> disease.

28 C.F.R. § 36, App. B. (commentary on Section 36.205).  The

Department's commentaries for its Title I and Title II

regulations also contain examples that demonstrate associational

discrimination.  Title I's commentary states: "This provision

would prohibit an employer from discharging an employee because

the employee does volunteer work with people who have AIDS, and

the employer fears that the employee may contract the disease."

29 C.F.R. § 1630, App. (commentary to Section 1630.8).  Title

II's regulation commentary states: "It would be a violation of

this paragraph for a local government to refuse to allow a

theater company to use a school auditorium on the grounds that

the company had recently performed for an audience of individuals

with HIV disease."  28 C.F.R. § 35, App. A (commentary on Section

35.130(g)).  These examples, provided by the Department of

Justice, all describe associational discrimination as

discrimination directed specifically against the non-disabled

individual.[7]

      The government, nevertheless, urges the Court to adopt a much broader interpretation. It directs the Court to two of its amici briefs that argue that indirect consequences experienced by those associated with a disabled individual raise a Title III associational discrimination claim.[8] P.'s Opp. Br. Exs. 1, 3.

      The Court is not required to defer to the government's arguments asserted in its past amici briefs and in this litigation because the Department's associational discrimination regulation does little more than restate the terms of the statute itself. See Gonzales v. Oregon, 546 U.S. 243, 257 (2006). When the Department of Justice creates a regulation that parrots a congressional statute, the government does not acquire special authority subsequently to interpret that regulation. Id.

      Although the United States Court of Appeals for the

---

[7] The government disputes the applicability of Title I to the Title III context. The distinction the government makes between the language of Title I and Title III does not turn on whether either provision protects against indirect consequences. The Court, therefore, finds that the commentary to the ADA's Title I and Title II regulations can be considered when construing Title III.

[8] The government also lists three settlement agreements that it has entered into with child care providers, a Frequently Asked Questions web page, a publication discussing the ADA, and the government's ADA technical assistance manual. P.'s Opp. Br. 35 n.31. It does not explain, nor does the Court find, how these materials advance the government's position or change the Court's analysis.

Third Circuit has not addressed the scope of ADA associational discrimination claims under Title III, it has found that direct discrimination against an individual, because of his or her association with a disabled person, constitutes associational discrimination in a Title II context.  In <u>Doe v. County of Centre</u>, 242 F.3d 437 (3d Cir. 2001), the court held that parents of an HIV-positive child were the victims of associational discrimination under the ADA because the county instituted a policy that restricted the parents' ability to become foster parents to non-HIV-positive children.  Finding that the policy directly discriminated against the parents solely on the basis of their child's disability, the court held that the policy was facially discriminatory towards the parents.  <u>Id.</u> at 447; <u>see also</u> <u>Falls v. Prince George's Hosp. Ctr.</u>, No. 97-1545, 1999 WL 33485550 (D. Md. Mar. 16, 1999) (holding that parent had an associational discrimination claim because hospital directly discriminated against parent by requiring parent to act as interpreter for deaf child).[9]

      Courts that have specifically addressed whether

_____

[9] The government cites <u>Falls v. Prince George's Hospital Center</u>, 1999 WL 33485550, to demonstrate that an entity's direct discrimination in a Title III associational discrimination setting may include not just denying a parent a benefit, but also obligating a parent to perform a task typically performed by the entity.  Although such action may constitute direct discrimination, the Court finds that the government has not sufficiently alleged facts for the Court to infer that NLC engaged in this type of discrimination.

indirect consequences give rise to an associational
discrimination claim have held that Title III of the ADA does not
protect against such injuries.  In <u>Simenson v. Hoffman</u>, No. 95 C
1401, 1995 U.S. Dist. LEXIS 15777, at *4 (N. D. Ill. Oct. 24,
1995), the court dismissed a Title III associational
discrimination claim brought by the parents of a child who was
refused medical treatment at a hospital.  The court reasoned that
because the hospital directly discriminated against the child,
and not the parents, the parents did not experience associational
discrimination.  <u>See</u> <u>id.</u> at *15-16.

        The court in <u>Glass v. Hillsboro School District</u>, 142 F.
Supp. 2d 1286 (D. Or. 2001), reached a similar conclusion and
dismissed a Title II associational discrimination claim based on
a "derivative-type injury" experienced by parents of disabled
students.  <u>Id.</u> at 1290.  In <u>Glass</u>, a school district denied
parents the opportunity to have "independent autism experts"
observe the parents' disabled children in class.  <u>Id.</u> at 1287.
The court dismissed the parents' associational discrimination
claim because it found that the parents were not denied separate
and distinct services apart from their role as parents.  <u>Id.</u> at
1292.  Because the parents did not attempt to have access to the
classroom for their own benefit, they suffered no direct
discrimination from the school district.  <u>Id.</u>

        In view of both the case law and the plain language of

Title III and its implementing regulation, the Court finds that indirect discrimination does not give rise to an associational discrimination claim, and the plaintiff fails to allege sufficient facts to allow the Court to infer that NLC directly discriminated against the disabled students' family members. Although the complaint alleges that families of disabled children suffered "the loss or denial of the opportunity to select, participate in, or benefit from" NLC's programs, these allegations read like "threadbare recitals of the elements" of an associational discrimination claim and are insufficient to withstand the defendant's motion to dismiss. See Compl. ¶ 21; Iqbal, 129 S. Ct. at 1949.

III. Conclusion

The Court grants the defendant's motion to dismiss the plaintiff's allegation of associational discrimination. It also grants the defendant's motion to dismiss the plaintiff's allegations of discrimination pursuant to a policy and a failure to provide reasonable modifications, to the extent that these allegations relate to the defendant's day care, elementary, and secondary schools, but it denies the defendant's motion to dismiss these allegations in relation to the defendant's preschools.

An appropriate Order shall issue separately.